ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>V.<br><br>CHRISTIAN J. VÉLEZ PEDROZA<br><br>Apelante | KLAN202400699 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Aguadilla<br><br>Caso Núm.:<br>A VI2023G0005<br>A BD2023G0030<br>A LA2023G0041<br>A LA 2023G0046<br><br>Sobre:<br>ARTS. 93(A) C.P. y 5.15 L.A. (2000) |

Panel integrado por su presidenta, la Juez Brignoni Mártir, la Jueza Álvarez Esnard y el Juez Sánchez Báez[1]

Sánchez Báez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 24 de marzo de 2025.

Comparece ante nos el Sr. Christian J. Vélez Pedroza (en adelante, "señor Vélez" o "apelante"), mediante un recurso de *Apelación* presentado el 24 de julio de 2024. Nos solicita la revocación de las sentencias emitidas y notificadas el 26 de junio de 2024 por el Tribunal de Primera Instancia, Sala Superior de Aguadilla (en adelante, "foro primario" o "foro *a quo*"). Mediante estas declaró al apelante culpable de violación a los Artículos 93 (b) (asesinato estatutario) y 190 (e) de la Ley Núm. 146-2012, según enmendada, conocida como *Código Penal de Puerto Rico,* 33 LPRA secs. 5142, 5260 (en adelante, "Código Penal"), así como a los Artículos 6.05 y 6.14 (b) de la Ley Núm. 168-2020, según enmendada, conocida como *Ley de Armas de Puerto Rico de 2020*, 25 LPRA secs. 466d, 466m (en adelante, "Ley de Armas"). Por todos

---

[1] Mediante la Orden Administrativa OATA-2025-002 emitida el 9 de enero de 2025 se designó al Juez Isaías Sánchez Báez en sustitución de la Jueza Annette M. Prats Palerm.

esos delitos fue sentenciado a una pena total de 129 años en confinamiento.

Por los fundamentos que expondremos a continuación, **se confirman** las *Sentencias* apeladas.

**-I-**

Por hechos ocurridos el 16 de enero de 2022, el Pueblo de Puerto Rico presentó cuatro (4) denuncias contra el señor Vélez. Luego de la determinación de causa probable para acusar, el Ministerio Público presentó las acusaciones correspondientes. En lo pertinente, se le acusó de —en mutuo acuerdo con el Sr. Isaac X. Ayala Poten (en adelante, "señor Ayala") y el Sr. Kevin J. Flores Morales (en adelante, "señor Flores")—: (1) dar muerte al Sr. Edward A. García González (en adelante, "señor García") al perpetrar o intentar cometer el delito de robo; (2) apropiarse de un teléfono celular y dinero en efectivo del señor García; (3) transportar y usar un arma de fuego sin tener licencia, siendo esa arma utilizada en la comisión de los delitos de asesinato y robo, y (4) apuntar y disparar un revólver en un lugar público contra el señor García, ocasionándole la muerte.

Luego de los trámites pertinentes, el 11 de enero de 2024 comenzó el juicio en su fondo, el cual duró hasta el 13 de febrero de 2024. Aquilatada la prueba presentada en el juicio, el foro primario emitió varias sentencias. Específicamente, mediante estas declaró al señor Vélez culpable de los siguientes delitos: (i) violación al Artículo 93 (b) del Código Penal (asesinato estatutario) y lo sentenció a 99 años de cárcel; (ii) violación al Artículo 190 (e) del Código Penal y lo sentenció a 25 años, ambas de forma concurrente; (iii) violación al Artículo 6.05 de la Ley de Armas y lo sentenció a 10 años, duplicada a 20 años por virtud del Artículo 6.01 de la Ley de Armas, y (iv) violación al Artículo 6.14 (b) de la Ley de Armas y lo sentenció a 5 años, duplicada a 10 años por virtud del Artículo 6.01 de la Ley de

Armas. Las condenas por la Ley de Armas serían consecutivas a las del Código Penal, para un total de 129 años de cárcel.

Inconforme, el señor Vélez recurrió antes nos mediante recurso de *Apelación* y esbozó los siguientes señalamientos de error:

A. Erró el Tribunal de Primera Instancia al emitir el fallo de culpabilidad en el caso de epígrafe a pesar de que no se probó la culpabilidad del acusado más allá de duda razonable.

B. Erró el Tribunal de Primera Instancia al emitir el fallo de culpabilidad a base de testimonios estereotipados y contradictorios entres si y que no vincularon al apelante con los actos imputados.

C. Erró el Tribunal de Primera Instancia al emitir sentencias consecutivas entre si en los Artículos 93(a) del Código Penal y el Artículo 6.14 de la Ley de Armas de Puerto Rico a pesar de que era de aplicación el concurso de delitos siendo ambas penas concurrentes entre sí.

Conforme a lo dispuesto en la Regla 29 del Tribunal de Apelaciones, 4 LPRA XXII-B, R. 29, y por argüirse que el foro primario erró en la apreciación de prueba oral, el apelante presentó ante esta Curia la transcripción del juicio. Esta quedó estipulada por las partes el 13 de noviembre de 2024. Por consiguiente, el 19 de diciembre de 2024, el apelante presentó su alegato.

El 21 de enero de 2025, la Oficina del Procurador General presentó el *Alegato del Pueblo.* Con el beneficio de la comparecencia de ambas partes y la transcripción de la prueba oral, procedemos a exponer la normativa jurídica aplicable al caso ante nuestra consideración.

**-II-**

**A. Presunción de inocencia y duda razonable**

La Constitución de Puerto Rico reconoce en la Sección 11 del Artículo II el derecho fundamental de la presunción de inocencia. Const. PR art. II, sec. 11. Esto es que un acusado no tiene la obligación de presentar prueba en su defensa o de que es inocente. *Pueblo v. Meléndez Monserrate*, 2024 TSPR 80, pág. 9, 214 DPR ___ (2024). Entiéndase, le corresponde al Estado la obligación de presentar evidencia y de cumplir con la carga de la prueba para

establecer la culpabilidad del acusado. *Pueblo v. Irizarry*, 156 DPR 780, 786-787 (2002). A los fines de rebatir esa presunción, las reglas 110 de Procedimiento Criminal y de Evidencia requieren que la culpabilidad de una persona acusada sea probada más allá de duda razonable. 34 LPRA Ap. II, R. 110 (2016) y 32 LPRA Ap. VI, R. 110 (2021). Para cumplir con ese estándar, y por consiguiente controvertir la presunción constitucional, el Ministerio Público tiene que presentar prueba suficiente y satisfactoria sobre: (1) cada uno de los elementos del delito, (2) su conexión con el acusado y (3) la intención o negligencia criminal de este. *Pueblo v. Meléndez Monserrate*, supra, pág. 9. Cumplir con esa máxima es un imperativo del debido proceso de ley. *Pueblo v. Irizarry*, supra, pág. 786.

Ahora bien, el estándar probatorio de más allá de duda razonable no requiere que se tenga que probar el caso criminal con certeza matemática. *Pueblo v. Toro Martínez*, 200 DPR 834, 856 (2018); *Pueblo v. Bigio Pastrana*, 116 DPR 748, 761 (1985). Lo que nuestro ordenamiento jurídico requiere es prueba suficiente y satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Toro Martínez*, supra. Por ende, la duda razonable que impide encontrar culpable al acusado no es una mera duda especulativa o imaginaria, o cualquier duda posible; es la insatisfacción racional de la conciencia del juzgador con la prueba presentada producto de todos los elementos de juicio del caso. *Íd.*, Véase, además, *Pueblo v. Irizarry*, supra, pág. 788; *Pueblo v. Bigio Pastrana*, supra, pág. 761. Es decir, "la duda razonable debe ser el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación". *Pueblo v. Irizarry*, supra. Como bien dispuso el Tribunal Supremo: "[e]n concreto, la duda razonable

existe cuando el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad con la prueba de cargo presentada". *Pueblo v. García Colón I*, 182 DPR 129, 175 (2011). De igual modo ocurre "cuando el juzgador queda insatisfecho con la prueba presentada". *Pueblo v. Santiago*, 176 DPR 133, 142 (2009).

La determinación de si se probó la culpabilidad del acusado más allá de duda razonable es revisable en apelación. Ahora bien, en esa delicada función revisora se debe tener presente que "la apreciación de la prueba corresponde, en primera instancia, al foro sentenciador por lo cual los tribunales apelativos sólo intervendremos con dicha apreciación cuando se demuestre la existencia de pasión, prejuicio, parcialidad o error manifiesto". *Pueblo v. Irizarry*, supra, págs. 788-789. Véase, además, *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 63 (1991). Asimismo, podremos intervenir cuando la apreciación de la prueba no concuerde con la realidad fáctica o esta sea inherentemente imposible o increíble. *Pueblo v. Irizarry*, supra, pág. 789.

Esta norma se fundamenta en el hecho de que "los foros de instancia están en mejor posición para evaluar la prueba desfilada, pues tienen la oportunidad de observar y escuchar a los testigos y, por ello, su apreciación merece gran respeto y deferencia". *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000).

De otro lado, nuestro ordenamiento jurídico no requiere una cantidad específica de testigos para probar la culpabilidad de un acusado más allá de duda razonable. *Pueblo v. Toro Martínez*, supra, pág. 859. Al contrario, el testimonio de un testigo por sí solo, de ser creído, es suficiente para sostener un fallo condenatorio aun cuando no fue un testimonio perfecto. Le corresponde al foro primario resolver los asuntos de credibilidad de un testigo cuando haya partes de su testimonio que sean aceptables. *Íd.*, pág. 860. Véase, además, *Pueblo v. Chévere Heredia*, 139 DPR 1, 15-16 (1995). De

ese modo, si un testigo se contradice, lo que está en juego es su credibilidad y es al foro primario a quien le corresponde resolver el valor probatorio de su testimonio. *Pueblo v. Toro Martínez*, supra, pág. 861. Adviértase que el testimonio perfecto no existe, y en lugar de ser indicativo de la verdad, es altamente sospecho, pues generalmente es producto de fabricación. *Pueblo v. Cabán Torres*, 117 DPR 645, 656 (1986).

**B. Concurso de delitos y la Ley de Armas**

Nuestro ordenamiento jurídico reconoce que en ocasiones una persona puede cometer mediante uno o más actos, varias ofensas, las cuales son valoradas y juzgadas conjuntamente en el mismo proceso judicial. *Pueblo v. DiCristina Rexach*, 204 DPR 779, 790 (2020). Cuando eso ocurre aplica la doctrina jurídica del concurso de delitos, "figura que atiende cómo debe determinarse cuál es la pena que mejor refleja la gravedad del hecho y la culpabilidad de la persona". *Íd.* A esos propósitos, la Ley Núm. 146-2012, según enmendada, conocida como *Código Penal de Puerto Rico*, establece en su Artículo 71 lo siguiente:

> (a) Concurso ideal y medial de delitos: Cuando sean aplicables a un hecho dos o más disposiciones penales, cada una de las cuales valore aspectos diferentes del hecho, o cuando uno de éstos es medio necesario para realizar el otro, se condenará por todos los delitos concurrentes, pero sólo se impondrá la pena del delito más grave.
> (b) Concurso real de delitos: Cuando alguien haya realizado varios delitos que sean juzgados simultáneamente, cada uno de los cuales conlleva su propia pena, se le sentenciará a una pena agregada, que se determinará como sigue:
> (1) Cuando uno de los delitos conlleve pena de reclusión de noventa y nueve (99) años, ésta absorberá las demás.
> (2) Cuando más de uno de los delitos conlleve reclusión por noventa y nueve (99) años, se impondrá además una pena agregada del veinte (20) por ciento por cada víctima.
> (3) En los demás casos, se impondrá una pena para cada delito y se sumarán, no pudiendo exceder la pena agregada del veinte (20) por ciento de la pena para el delito más grave.
>
> 33 LPRA sec. 5104.

Como se notará, el concurso ideal se configura cuando en un solo hecho o unidad de conducta infringe varios tipos delictivos que tutelan bienes jurídicos distintos. *Pueblo v. Álvarez Vargas*, 173 DPR

587, 592-593 (2008). Por tanto, se acusa a la persona por más de un delito, pero si las violaciones son producto de una misma conducta, solamente se sanciona a la persona con la pena del delito más grave. *Pueblo v. DiCristina Rexach,* supra. Véase, además, *Pueblo v. Álvarez Vargas*, supra.

Por otro lado, el concurso medial ocurre cuando múltiples hechos delictivos ocasionan una pluralidad de delitos. *Íd.*, pág. 593. Específicamente, uno de los delitos es medio necesario para cometer otro. *Pueblo v. DiCristina Rexach,* supra, pág. 790. En estos casos, nuestro ordenamiento jurídico lo trata igual que el concurso ideal. *Pueblo v. Álvarez Vargas*, supra, pág. 593.

Por último, el concurso real aplica cuando varias unidades de conducta violan la misma ley o normas penales distintas. Para que se configure es necesario que una persona cometa varios actos, se infrinjan varios delitos y que sean juzgados simultáneamente. *Pueblo v. Álvarez Vargas*, supra, pág. 594.

De otro lado, la Ley Núm. 168-2020, según enmendada, conocida como *Ley de Armas de Puerto Rico de 2020,* establece en su Artículo 6.01 que "[t]odas las penas de reclusión que se impongan bajo esta Ley serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley". 25 LPRA sec. 466. Al respecto, la profesora Dora Nevares Muñiz, al comentar sobre el Artículo 7.03 de la derogada Ley de Armas, que disponía de forma similar, expuso lo siguiente:

> En este caso el art. 7.03 de la Ley de Armas dispone para la imposición de penas consecutivas entre sí y con cualquier otra ley. Este es un ejemplo de una excepción al concurso establecida por el legislador. En este caso se impondrá la pena que corresponda bajo el Código Penal y la pena por la Ley de Armas se cumplirá de forma consecutiva con esa pena.

D. Nevares, Derecho Penal Puertorriqueño, 6ta ed. Rev., San Juan, Ed. Inst. Desarrollo del Derecho, 2005, págs. 389-390.

Tómese en cuenta que el Tribunal Supremo validó en *Pueblo v. Bonilla Peña,* 183 DPR 335, 352 (2011), que las penas de la ley de

armas fueran consecutivas al indicar que "[l]as penas carcelarias dispuestas en la Ley de Armas se impondrán de forma consecutiva a cualquier otra sentencia". Asimismo, desde *Pueblo v. Calviño*, 110 DPR 691 (1981), nuestro máximo foro judicial validó la facultad legislativa para imponer castigos independientes y consecutivos en delitos configurados por un único acto.

Discutido el derecho aplicable, este Tribunal se encuentra en posición para resolver las controversias señaladas en el recurso de epígrafe.

**-III-**

**A.**

Por estar relacionados, procedemos a la discusión conjunta del primer y segundo señalamiento de error. En esencia, el apelante cuestiona que el foro primario lo haya encontrado culpable más allá de duda razonable a pesar de que a su juicio el testimonio del testigo cooperador —el señor Ayala—, el cual es el único que lo vincula directamente con los delitos, no es cónsono con los testimonios de los otros testigos. Particularmente, debate la descripción física dada por los testigos y su realidad física. Arguye que los otros testigos indicaron que quien disparó era una persona más alta que el occiso. En cambio, sostiene que él tiene una estatura de 5' 3" y que pesa 250 libras. Asimismo, cuestiona la credibilidad del señor Ayala, pues a su entender debe ser considerado un testigo mendaz, ya que admitió en el juicio que mintió en una declaración jurada y aceptó cooperar en el caso para obtener un beneficio.

Por su parte, el Procurador General arguye en relación con las incongruencias en la descripción física del apelante, que no es posible requerir que las víctimas de un robo ocurrido en la madrugada y en segundos ofrezcan una descripción fiel y exacta de la persona que lo comete. Asimismo, argumenta que la prueba pericial demostró que la persona que haló el gatillo era más bajita

que el occiso. Por otro lado, sostiene que, aunque el señor Ayala aceptó que mintió en la primera declaración jurada sobre el motivo del asesinato, el resto de su declaración fue consistente.

Reiteramos que, la norma en estos asuntos es que le corresponde al foro primario resolver los asuntos de credibilidad de los testigos y a quien le atañe examinar el valor probatorio de los testimonios ofrecidos en corte. Este foro apelativo intermedio no intervendrá con esa función judicial a menos que haya ocurrido pasión, prejuicio, parcialidad o error manifiesto por parte del foro *a quo*. Tomando eso en consideración, este tribunal examinó detenidamente la transcripción de la prueba estipulada por las partes y concluye que no están esos elementos que motiven a este foro a intervenir con la determinación apelada. Veamos.

La realidad es que los testimonios de ambos testigos a los que alude el señor Vélez no son tan determinantes en cuanto a la descripción física de la persona que cometió el asesinato. En primer lugar, el Sr. Pierre Edzel Vega Miranda (en adelante, "señor Vega") durante su testimonio indicó a preguntas de la defensa que "la estatura es subjetiva".[2] Además, explicó que la declaración que había ofrecido sobre el tamaño de la persona que vio apuntando al occiso fue en referencia a su propia altura y no del occiso.[3] Asimismo, aseveró que era más bajita que él, quien mide 5' 9".[4] Aunque sí describió a la persona que vio apuntando como de 5' 8" a 5' 10". Estas expresiones fueron reafirmadas en el redirecto, en el cual el señor Vega explicó que "basado en lo como … cuanto yo mido... yo... **estimé** a que… la estatura de la persona".[5] De acuerdo con eso, describió a esa persona como "más bajita" en relación con él.[6]

---

[2] Transcripción de la prueba oral (en adelante, "TPO"), pág. 120, líneas 16-20.
[3] TPO, pág. 121, líneas 1-5.
[4] TPO, pág. 121, líneas 6-11.
[5] TPO, pág. 129, líneas 18-22 (énfasis suplido).
[6] TPO, págs. 129-130.

Segundo, la Sra. Vanessa Diane Villanueva Charneco (en adelante, "señora Villanueva") durante su testimonio indicó algo similar. A preguntas de la defensa expresó que podría decir que la persona que se acercó al occiso era más alta que él, **pero no de forma exacta.**[7] Ahora bien, a preguntas del Ministerio Público explicó que no podría decirlo exactamente "[p]orque como era de lejos, era... no estaba... no era muy claro el día todavía. Este... también **eso es una bajada y subida**, **que se puede ver más alto**, **más bajito**. Pues por eso".[8]

Por tanto, este tribunal concluye que esos dos testimonios no son determinantes y no imputan a una persona totalmente distinta al apelante, como este argumenta en su recurso. Asimismo, tomamos en consideración el argumento del Procurador General de que la prueba forense estableció que el disparo que mató al occiso ocurrió ligeramente de abajo hacia arriba, lo que podría ser indicativo que la persona que lo cometió era más bajita que el occiso.[9]

Nótese que el apelante no hace referencia a ninguna parte de la transcripción de la prueba para sustentar su argumento. Así pues, eso, unido a las expresiones de ambos testigos que demuestran que no estaban seguros de la estatura precisa de la persona que disparó contra el occiso, así como lo establecido en la prueba pericial, nos lleva a descartar el argumento del señor Vélez.

A su vez, es importante señalar que de la prueba presentada en la sala surgió que el propio apelante le indicó al agente Juan C. Pérez Hernández que el vehículo en el que cometieron los delitos estaba en un lugar, en el cual efectivamente fue encontrado.[10] Esto demuestra, confirma y corrobora que el señor Vélez estuvo

---

[7] TPO, pág. 143, líneas 7-14.
[8] TPO, pág. 144, líneas 9-14 (énfasis suplido).
[9] TPO, pág. 28, línea 10.
[10] TPO, págs. 283, 287-288, 335.

involucrado en los delitos imputados. Debemos en este punto resaltar que, aunque el apelante fue inicialmente acusado de asesinato en primer grado en modalidad del inciso "a" del Artículo 93 del Código Penal (asesinato a propósito o con conocimiento), *supra*, ésta acusación fue enmendada y el apelante fue finalmente encontrado culpable por Tribunal de Derecho por el inciso "b" del referido Artículo 93 (asesinato estatutario).

De otro lado, en cuanto a la credibilidad y mendacidad del señor Ayala, este tribunal confiere total deferencia al foro primario en cuanto a la evaluación de su testimonio.  El apelante alega que a su entender ese testimonio debe ser descartado por ser un testigo mendaz, ya que admitió en el juicio que mintió en una declaración jurada y aceptó cooperar en el caso para obtener un beneficio.

El Tribunal Supremo ha reiterado que el hecho de que un testigo falte a la verdad no acarrea necesariamente que deba prescindirse del resto de la declaración. Así, "la máxima *falsus in uno, falsus in omnibus* no autoriza a rechazar toda declaración de un testigo porque se haya contradicho o faltara a la verdad en parte de su testimonio". *Pueblo v. Pagán Santiago*, 130 DPR 470, 483 (1992). A tales efectos, lo que resulta imprescindible es la evaluación de la totalidad de la prueba para determinar la conclusión a la que deba llegarse. Ello es importante porque los casos no deben ser resueltos a base de detalles que no están relacionados con el aspecto principal de la controversia. *Pueblo v. Espinet Pagán*, 112 DPR 531, 536 (1982).

De otra parte, la Regla 156 de Procedimiento Criminal, 34 LPRA Ap. II, R. 156, establece que "[e]l testimonio de un coautor será examinado con desconfianza y se le dará el peso que estime el juez o el jurado luego de examinarlo con cautela a la luz de toda la evidencia presentada en el caso". Al interpretar esa regla, el Tribunal Supremo aclaró en *Pueblo v. Echevarría Rodríguez,* 128 DPR 299,

317 (1991), que el testimonio o la "confesión" de un coautor no requiere corroboración. Ahora bien, esa norma "pretende atenuar su potencial valor probatorio ante los ojos del juzgador debido a la naturaleza particular de dicho testimonio". *Íd.*, pág. 318.

En este caso, según la transcripción de la prueba oral estipulada por las partes, el señor Ayala —coautor de los hechos— reconoció en sala que en la primera declaración jurada que dio al Ministerio Público mintió al decir que el motivo del asesinato fue por una deuda de un kilo de fentanilo.[11] Además, explicó que mintió por estar nervioso y desesperado, al ser la primera vez que choteaba a una persona.[12] Sin embargo, admitió en el juicio que luego de haber sido citado por el Ministerio Público para el otro día, les aclaró que había mentido y que el motivo verdadero fue un robo para obtener dinero para janguear el próximo fin de semana.[13] Este dato fue corroborado por los agentes de la policía.[14]

Nótese, además, que en este caso la mentira del testigo fue en el proceso investigativo y no en el proceso judicial. Esto de por sí no provoca que se deba descartar todo su testimonio en corte. Asimismo, surge que en el juicio reconoció su error. No conforme con ello, al examinar con detenimiento el resto de su declaración, no se desprende que haya elementos de mendacidad adicionales. Máxime cuando lo declarado por el testigo fue corroborado y es cónsono de forma general y en lo pertinente con los demás testimonios.[15]

Particularmente, en el juicio los testimonios presentados demostraron que el 15 de enero de 2022, el apelante junto al señor Ayala y el señor Flores salieron a janguear por Mayagüez.[16] En ese

---

[11] TPO, págs. 166-168, 170-171, 191-197.
[12] TPO, págs. 192, 290-291.
[13] TPO, págs. 157-158.
[14] TPO, pág. 291, 323, 328.
[15] Además, parte de la corroboración fue realizada por vídeos de seguridad y compañías de celulares. TPO, págs. 258-276, 289-291.
[16] TPO, págs. 149-152, 251

jangueo, el señor Vélez compró un arma de fuego.[17] Posteriormente regresaron a Aguada.[18] Por su parte, durante esa madrugada, el occiso, el señor Vega y la señora Villanueva acordaron encontrarse en el campo de golf de la Base de Aguadilla para fumar marihuana.[19] Estuvieron unas cuantas horas.

Coetáneamente, el apelante, el señor Ayala y el señor Flores planearon hacer un robo para buscar dinero para janguear el otro fin de semana.[20] Por tanto, fueron en dirección a la Base de Aguadilla en el vehículo del apelante, un Hyundai Excel blanco. En el área del campo de golf encontraron dos vehículos, una guagua Toyota Rav4 blanca y un Dodge Neon gris oscuro.[21] Ante ello, el señor Vélez se bajó, se puso guantes, máscara y "jacket".[22] Al ver eso, el señor Vargas le indicó al occiso y a la señora Villanueva que se tenían que ir debido a que se había detenido un carro. Por su parte, el señor Vélez llegó hasta donde ellos y les gritó que era un asalto.[23] Debido a eso, el señor Vega huyó de la escena en su guagua.[24] Por su parte, el occiso salió corriendo, pero el señor Flores se bajó para asustarlo.[25] En ese momento, el apelante le disparó al occiso.[26] El señor Flores le tomó el teléfono y el apelante el dinero.[27] Cuando el señor Ayala le reclamó, el señor Vélez le indicó que "los códigos son los códigos".[28] Posteriormente, todos se fueron a la casa del apelante.[29]

Así pues, luego de evaluar detenidamente toda la prueba presentada en el juicio, este tribunal concluye que el foro *a quo* no

---

[17] TPO, págs. 153-154, 180, 251.
[18] TPO, págs. 155, 184, 251.
[19] TPO, págs. 86-89, 111-115, 135-136, 241.
[20] TPO, págs. 157, 201.
[21] TPO, págs. 157-159, 242, 254.
[22] TPO, págs. 94, 119, 138, 160.
[23] TPO, págs. 76, 79, 97, 138-139, 160, 244, 248.
[24] TPO, págs. 97-98, 122-123, 138-139, 161, 244, 248, 257.
[25] TPO, pág. 255.
[26] TPO, págs. 98, 125, 139, 162-163, 218, 244, 248, 256.
[27] TPO, pág. 163, 256.
[28] TPO, pág. 164, 257.
[29] TPO, pág. 164.

cometió pasión, prejuicio, parcialidad o error manifiesto al evaluar la prueba. Por tanto, el primer y segundo señalamiento de error no fueron cometidos.

**B.**

Por último, atendemos el tercer señalamiento de error. En síntesis, el señor Vélez cuestiona que haya sido condenado por el Artículo 6.14 de la Ley de Armas, *supra*, y por el Artículo 93 (b) del Código Penal, *supra*, de forma consecutiva. Específicamente, alega que la acción de apuntar, disparar y asesinar quedó comprendida en una sola unidad de hechos, por lo que aplica el concurso ideal de delitos. De esa forma, argumenta que debió ser condenado por ambos delitos únicamente a 99 años. Por su parte, el Procurador General sostiene que, por disposición de la Ley de Armas, las penas deben ser consecutivas. No tiene razón el apelante.

La Ley de Armas es una ley penal especial a la que, conforme el Artículo 1 del Código Penal, 33 LPRA sec. 5001, le serían aplicables las normas generales de ese código, salvo que se disponga lo contrario. A esos fines, el Artículo 7.03 de la Ley de Armas, *supra*, directamente establece la consecutividad de las penas impuestas por esa legislación, fuese entre delitos contenidos en esa ley o con respecto a delitos contenidos en cualquier otro estatuto. Dicho de otra forma, el Tribunal de Primera Instancia estaba obligado por las disposiciones de la Ley de Armas a imponer las penas de manera consecutiva. Por tanto, el foro *a quo* actuó correctamente al imponer las penas de los delitos de la Ley de Armas y del delito de asesinato en primer grado de forma consecutiva. No se cometió el tercer señalamiento de error.

**-IV-**

Por los fundamentos previamente expuestos, se **confirman** las *Sentencias* apeladas.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones